# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GRANT HEWITT BALDERREE,<br><br>                       Plaintiff,<br>  vs.<br><br>F. CHAVEZ, Warden,<br><br>                       Defendant. | CASE NO. 11cv2782-LAB (WVG)<br><br>**ORDER ADOPTING REPORT AND RECOMMENDATION; AND**<br><br>**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS** |

Petitioner Grant Balderree, a prisoner in state custody, filed a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. This matter was referred to Magistrate Judge William Gallo for report and recommendation, pursuant to 28 U.S.C. § 636 and Fed. R. Civ. P. 72. Judge Gallo issued his report and recommendation (the "R&R"), to which Balderree has filed objections.

A district court has jurisdiction to review a Magistrate Judge's report and recommendation on dispositive matters. Fed. R. Civ. P. 72(b). "The district judge must determine de novo any part of the magistrate judge's disposition that has been properly objected to." *Id*. "A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1). The Court reviews de novo those portions of the R&R to which specific written objection is made. *United States v. Reyna-Tapia*, 328 F.3d 1114, 1121 (9th Cir. 2003) (en banc). "The statute

makes it clear that the district judge must review the magistrate judge's findings and recommendations de novo *if objection is made*, but not otherwise." *Id.*

The background facts are taken from the R&R. Because most of them are uncontested, the Court repeats only the minimum here, to put its decision in context. On June 12, 2007, police sought to arrest Balderree pursuant to an arrest warrant. They waited in unmarked vehicles, including a silver SUV and a brown SUV, outside a residence in the City of La Mesa where they thought he was. When the officer driving the silver SUV decided someone may have identified him as a police officer, he left, and radioed for marked police vehicles to set up a perimeter. About 20 minutes later, officers in the brown SUV saw Balderree leave the residence and begin driving away. They followed him, and the officer in the silver SUV also returned. As Balderree drew within about 40 or 50 feet of the silver SUV, he turned around and began driving back towards where the brown SUV was. The officer driving the brown SUV positioned it at an angle to try to prevent Balderree from escaping, and the officer in the silver SUV activated police lights and the siren.

What happened next is the bone of contention. Witnesses testified that Balderree drove towards the gap between the front of the brown SUV and an unoccupied parked truck and accelerated through it, striking both vehicles and pushing the brown SUV out of the way. At trial, Balderree's counsel argued he had inadvertently struck the police vehicle while trying to drive past it. (This is the "inadvertent strike" defense.) Balderree's version of the facts, which he now urges, is that he was rammed by the brown SUV. (This is the "ramming" defense.)

Balderree was convicted of assault with a deadly weapon against a police officer, resisting a police officer, and vandalism resulting in damage exceeding $400. Balderree's petition raised four claims: ineffective assistance of trial counsel ("IAC"), a *Brady* violation resulting from video evidence prosecutors withheld, improper admission of prior high speed vehicular flight from police, and insufficient evidence It is unchallenged that the prosecution's theory of the case, if proved, would support convictions on all counts.

/ / /

Balderree pursued habeas remedies through California's courts at the Superior Court, Court of Appeal, and Supreme Court level. The Court of Appeal's decision is the last reasoned decision, except as to one issue (discussed below) where the Superior Court's decision is the last reasoned decision.

**Discussion**

Not all of Balderree's claims require a great deal of discussion, and the Court will address the most straightforward first. The R&R sets forth the legal standards and background for each claim, which the Court repeats here only as necessary for purposes of discussion.

### *Brady* Violation

Balderree's theory is that the unmarked police vehicles have dashboard cameras, and that police failed to turn over video of the incident in response to his attorney's request, in violation of *Brady v. Maryland*, 373 U.S. 83 (1962). The R&R correctly pointed out that the *Brady* claim and the IAC rest on contradictory allegations: the IAC claim rests, in part, on the assumption that his counsel failed to request the video recordings, while the *Brady* claim is seriously undermined, if not destroyed, if that is the case.

A more serious problem for Balderree is that it isn't even clear that the video recordings he seeks ever existed. He claims it is common knowledge that all black-and-white police units in the City of La Mesa are equipped with video devices. The R&R points out he doesn't have any evidence of this, and that even if the units were equipped with video devices, there is no evidence they were turned on. And even if they were turned on, there is no evidence they captured any useful information. The silver and brown SUVs were unmarked vehicles, and Respondent's uncontroverted evidence shows that unmarked police vehicles are not equipped with video devices. They deny they had any video evidence.

Balderree's objections claims that "there is a strong possibility that one or more [video devices in police units] captured some, if not all, of the accident." (Obj. to R&R, 16:22–24.) He asks the Court to hold an evidentiary hearing to find out if the units did have video devices and, if so, whether the video devices captured any footage of the accident. "In

deciding whether to grant an evidentiary hearing, a federal court must consider whether such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief." *Schriro v. Landrigan*, 550 U.S. 465, 474 (2007). Here, however, the hearing would be meaningless because Balderree has no evidence to present. All he has is his own speculation that a video recording of the accident might exist. Even accepting his allegations as true, he would not be entitled to relief.

What he actually seems to want is discovery, so that he can uncover evidence that would entitle him to a hearing. But habeas petitioners have no right to discovery in federal court. *Bittaker v. Woodford*, 331 F.3d 715, 728 (9th Cir. 2003) (en banc). Federal courts have discretion to grant discovery when certain conditions are met, *id*., but those conditions are not met here.

**Improper Admission of Previous High-Speed Vehicular Flight from Police**

The state trial court, relying on Cal. Evid. Code § 1101, ruled that evidence of two prior high-speed vehicular chases in which Balderree was involved were admissible, because they tended to prove absence of mistake, motive, and knowledge. Specifically, the prior chases were offered to show that Balderree's ramming the brown SUV was not a mistake, that he wanted to escape from them, and that he knew how police officers conduct vehicular pursuits. The R&R pointed out that there is no Supreme Court decision forbidding the admission of propensity evidence, and that the state court decision could not have been contrary to the Supreme Court's holdings. *See* 28 U.S.C. § 2254(d)(1).

Balderree objects that the evidence admitted against him was false, because one of the chases occurred when he was driving a Winnebago, and a Winnebago cannot travel very fast. This is a weak argument, and the state court's finding in support of admissibility was not unreasonable. Trying to evade police while driving a Winnebago would be a desperate and foolish act, but suspects wishing to flee police generally have little choice of vehicle and commonly make use of whatever is at hand or whatever they happen to be driving.

Balderree also argues that there must be some Supreme Court precedent forbidding the admission of prior bad acts evidence, but there he is wrong. *See Jennings v. Runnels*,

493 Fed. Appx. 903, 906 (9th Cir. 2012) ("[T]he Supreme Court has not held that propensity evidence violates due process.")  In fact, under the circumstances the R&R describes, Balderree's two prior chases were not even admitted as propensity evidence. Rather, they were admitted for purposes that would be permissible even under the Federal Rules of Evidence. *See* Fed. R. Evid. 404(b)(2).

**Insufficient Evidence of Felony Assault**

The R&R mentions the strong evidence tending to show Balderree intentionally, not accidentally, rammed the brown SUV. Balderree's objections focus on selected portions of the evidence that he thinks weaken the case against him. The standard is set forth in *Jackson v. Virginia*, 443 U.S. 307, 318–19 (1979) and *Coleman v. Johnson*, 132 S.Ct. 2060 (2012) (per curiam). What is more, the state courts' determination of whether that standard is met need not be one this Court agrees with; it need only be reasonable. *See Cavazos v. Smith*, 132 S.Ct. 2, 4 (2011). This Court's review is therefore doubly deferential. *See Boyer v. Belleque*, 659 F.3d 957, 964 (9th Cir. 2011) (when a federal habeas court assesses a sufficiency of the evidence challenge to a state court conviction under AEDPA, "there is a double dose of deference that can rarely be surmounted.")

Here, the state court's judgment quite easily survives review. There was ample evidence from which the jury could have determined that Balderree intentionally rammed the brown SUV, instead of the brown SUV ramming his car, including the testimony of three police officers, his motive to evade police, and physical evidence. Balderree's claim that the physical evidence showed he could not have rammed the brown SUV is inapt. Even accepting his characterization of the damage to the vehicle (*i.e.*, that the brown SUV's damage was limited to front-end damage, and that the only damage to Balderree's vehicle was a damaged passenger-side door and window), this is hardly exonerating. Prosecution witnesses testified that the brown SUV was stopped at an angle, and that Balderree tried to ram it out of the way, so as to squeeze between it and a parked truck. In a collision like that, it would be expected that both the brown SUV's front end and Balderree's vehicle's side
/ / /

would be damaged. In other words, the physical evidence Balderree describes is consistent with the prosecution's case.

**IAC Claims**

As with sufficiency of the evidence, this Court's review of IAC is "doubly deferential." *Miles v. Ryan*, 713 F.3d 477, 487 (9th Cir. 2013). The R&R concluded that Balderree's trial counsel's performance was deficient in several respects, but concluded he hadn't shown prejudice. In his objections, Balderree sets forth a cumulative prejudice theory. In other words, he argues that the errors, taken as a whole, unfairly prejudiced him. The Court does not completely agree with the R&R's finding of error.

Balderree was initially represented by a Mr. Kirkness, who conducted adequate investigations, but then Daniel Cohen assumed the representation. Kirkness said he sent the results of his investigations to Cohen, but Cohen denied receiving it.

Balderree's objections identify twelve errors Cohen allegedly made. (Obj. to R&R, 4:19–5:7.) He doesn't argue that the R&R's analysis of the prejudicial force of any of these is wrong. Rather, he argues that, cumulatively, they are sufficiently prejudicial. Balderree's objection that the existence of multiple deficiencies 'obviates the need to find individual prejudice." (Obj. to R&R, 5:17–18, 10:8–13.) His argument is that the overall number of errors is what counts; if his counsel made the requisite number, prejudice should be presumed. (*Id*., 5:27–28 ("Four deficiencies constitutes cumulative impact of multiple deficiencies."), 6:14–16.) He misreads the authority he has cited, however. Simply listing multiple errors counsel made (or supposedly made) does not obviate the need to find prejudice; rather, it obviates the need to find prejudice from any one error. *See Mak v. Blodgett*, 970 F.2d 614, 622 (9th Cir. 1992). The fact that several errors are identified does not by itself show cumulative prejudice. *See Yates v. Small*, 357 Fed. Appx. 40, 42 (9th Cir. 2009) (observing that the claimed errors by trial counsel "were not prejudicial individually or cumulatively"). Furthermore, some errors are harmless, and don't help establish IAC at all. *See Miles*, 713 F.3d at 486–87.

/ / /

### Communication with Trial Counsel

The first three alleged errors amount to a complete lack of communication: "(1) refusing to discuss trial strategy or tactics with petitioner; (2) refused to accept telephone calls from petitioner; (3) refused to meet with petitioner . . . ." (*Id*. at 4:19–22.) The R&R, liberally construing Balderree's petition, determined that Balderree was raising these claims. And Balderree, in his objections to the R&R, joins in with this and agrees that he really was raising these claims.

But the Court disagrees these were ever adequately raised. Instead, all Balderree expressed was dissatisfaction with how his and Cohen's communications had gone. The Petition does say, in passing, that Cohen didn't communicate as much as, or in the manner Balderree would have liked. ((Pet., 13:22–14:2.) But the rest of the allegations undercut any suggestion that there might have been a lack of attorney-client communication.

Respondent never raised failure to exhaust as a defense, but for that he cannot be faulted, because this argument is a new one. The first time it appears is really in the R&R, where it is rejected as being unsupported by the record. The Court, however, believes the R&R construed the Petition too liberally, as making arguments it never really made.

When presenting his case to the California Supreme Court, Balderree used a petition very similar to the one he filed here. Both are verified. (*See* Lodgment 14 at 10 (verification); Pet. at 12 (same).) In his petition to the California Supreme Court, Balderree never told that court that Cohen failed to communicate with him. To the contrary, he emphasized his frustration when meeting with Cohen on multiple occasions, because he and Cohen were at odds over what evidence should be investigated, what the defense strategy should be, and whether Balderree should plead guilty or go to trial. His argument was that Cohen's assistance was ineffective because Cohen knew what Balderree wanted him to do, but refused. Balderree attests, for example, that Cohen talked briefly before pretrial hearings, urging Balderree to accept a plea agreement. (Lodgment 14, 11:17–20.) He says Cohen told him several times he wanted to dispose of the case quickly. (*Id*., 11:21–22.) He says that he "pleaded with Mr. Cohen to hire an investigator, to obtain statements or declarations from

possible witnesses . . . ," (*id*.11:23–24), and that he "made counsel aware on numerous occasions of the existence of the witness Nancy Lattman, and the importance of her testimony." (*Id*., 11:28–12:2.) He also says he "pleaded with Mr. Cohen at the very least to have the three vehicles examined." (*Id*., 12:19–20.) The Court also notes that Balderree made similar attestations in his Petition, as well as making similar allegations in his traverse in this case. In fact, his traverse bulks those claims up by mentioning his and Cohen's respective demeanors and responses as they interacted. (*See* Traverse (Docket no. 10), ¶¶ 16–19.)

Balderree cannot now make arguments that he never gave the California Supreme Court any opportunity to consider, *see Dickens v. Ryan*, 688 F.3d 1054, 1067–69 (9th Cir. 2012) (holding that ineffective assistance of counsel claim was procedurally barred, to the extent it raised new evidence state courts had never had an opportunity to consider), and this Court's review is limited to the record before the state courts. *See Cullen v. Pinholster*, 131 S.Ct. 1388, 1400 (2011). And in any event, Balderree's claim to habeas relief in this Court cannot rest on allegations contradicted by the record in both the state court and this court, and by his own earlier sworn statements.

It may well be that Balderree's relationship with his trial counsel was poor, and his counsel didn't communicate as often as Balderree wished, or in the times or ways Balderee wanted him to (by accepting his collect phone calls, for example). But it is perfectly clear they communicated "on numerous occasions" about issues pertaining to Balderree's defense. (*See, e.g.*, Lodgment 14 at 11:28–12:2 (attesting under penalty of perjury that he talked with Cohen "on numerous occasions" about Nancy Lattman's potential testimony).) And while it is understandable that a criminal defendant might be hostile to his counsel's advice to plead guilty, that does not render that advice inappropriate.

**Pretrial Investigation**

Balderree next objects that his counsel "failed to investigate, or interview witnesses identified by petitioner [and] failed to conduct any reasonable pretrial investigation." In one respect, Balderree had a great advantage over other habeas petitioners. He was initially

represented by Mr. Kirkness, who conducted the investigations Balderree says Cohen should have. Assuming there was any evidence to be found, all Balderree had to do was obtain that from Kirkness and present it to the state habeas court. Or, if the evidence was lost and no duplicates were available, he could have asked Kirkness to provide an admissible statement of what the evidence was. If his evidence was newly-discovered and could not reasonably have been discovered and presented it earlier, he could have presented it to this Court. But he has not presented any such evidence.

Balderree never told the state courts who most of those witnesses were or what their testimony would have been. In fact Balderree wasn't even able to say for certain whether there were any witnesses, only that there might have been, and that one of them might have been able to offer testimony favorable to him. (*See* Lodgment 14 at 11:25–27 (Balderree's statement that he "suspects" that one or more of his neighbors saw the incident).)

The sole exception was Balderree's girlfriend, Nancy Lattman. The R&R considered whether her testimony would have supported the theory of defense Balderree now advances, *i.e.*, that the brown SUV rammed him. But the R&R concluded there was no prejudice because Lattman's testimony was not compelling. As his girlfriend, she was not a disinterested party, and her testimony would have been weighed against that of the three police officers whom the jury ultimately believed.

The Court believes it is useful to augment this analysis, based on Lattman's declaration. (Traverse, Ex. A (Docket 10-1 at 4–5).) The declaration says Lattman was arrested at the time of the incident, then coaxed into writing out a version of facts for police that she made deliberately ambiguous. (*Id*. at 4.) Had she testified in this manner on the stand, she could have been impeached with her written statement and many juries would have questioned her veracity. But this is hardly the greatest weakness.

Balderree's own sworn version is that he was trying to negotiate the gap between the parked truck and the brown SUV when the brown SUV turned and hit him. (Pet., 7:24–8:18; 43:19–28.) This is the version he presented to the state courts. (Lodgment 14 at 5:21–6:18). The state courts, in adjudicating Balderree's claims, noted that he had told them

he was trying to negotiate the gap when the brown SUV turned and hit him (Lodgment 13 (Court of Appeals decision) at 2), but made the factual finding that he approached the gap between the two vehicles and hit the brown SUV while attempting to accelerate between them. (*Id*. at 1.)   Lattman's testimony would have been dramatically different:

> He [Balderree] turned and was coming back toward me when (it seemed) out of nowhere, this brown SUV came roaring down the street directly toward my car (and Grant) as I said, my street was very narrow. The SUV was heading directly toward Grant, so Grant turned away from him toward the north side of the street, directly toward me. It was the only place open he could turn to avoid a head on collision with the SUV. The SUV turned into the side of my car as Grant was passing him, and Grant struck my neighbors truck at about the same time. This all happened so quickly. It was directly in front of me, I could see the expression on the men's faces, their expectation of imminent collision, even bracing themselves. It was undoubtedly intentional that the rammed Grant in my car.

(Lattman Ltr. (Lodgment 14, Ex. D; Docket no. 10-1 at 5).)

Had Lattman taken the stand and so testified, she would have been impeached with her own inconsistent statements to police. Her testimony, which amounts to a charge that the police were playing "chicken" with Balderree, would be implausible in light of that, inexplicable in light of the rest of the facts, and inconsistent with other evidence.[1] Testimony of this nature would not have been helpful, and could certainly have been harmful. The Court rejects Balderree's argument that Lattman would have been found credible.

Balderree doesn't identify any other testimony or evidence that Cohen's pretrial investigation should have uncovered, much less a reasonable probability that any such evidence would have been helpful to him. *See Strickland*, 466 U.S. at 694 (petitioner must establish a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different).

**Communication About Possible Meritorious Defenses**

Cohen's failure to interview Lattman and to offer her testimony was therefore not prejudicial. Because she was the only source of evidence to support a "ramming defense,"

---

[1] The scenario Lattman describes, involving accelerated speeds and both vehicles being in motion, would be expected to be more destructive than this one was, with Balderree's vehicle being driven into the parked truck and the brown SUV sustaining serious damage to its front end. In addition, a recording of police radio communications during the incident was played at trial.

failure to present that defense was also not prejudicial.[2] Balderree identifies no other potential defense he might have had that Cohen failed to elicit from him.

**Failure to Request Video Recordings of the Incident**

In addition to the *Brady* analysis above, the Court notes that the state courts determined that Cohen did request the video recordings, and was told there were not any. (Lodgment 13 at 1–2.) The R&R concluded the Court of Appeals misread the evidence because the record wasn't clear whether Cohen ever asked for video evidence from the marked police cars or made a formal discovery request. But the Court rejects this conclusion, because it is insufficiently deferential to the state court's factual adjudication, and also presumes the state courts didn't realize their own law required some kind of formal discovery request.

Under California law, which parallels many of the *Brady* requirements, prosecutors must disclose evidence seized or obtained as part of the criminal investigation, and any exculpatory evidence they have. Cal. Penal Code § 1054.1. A request for informal discovery is sufficient to trigger broad disclosure by prosecutors. *See People v. Little*, 59 Cal. App. 4th 426, 435 (Cal. App. 3 Dist. 1997). An informal request the required first step in a defendant's discovery process; there is no alternate procedure. Cal. Penal Code § 1054.5(a) and (b). If, within 15 days after an informal request, the requested evidence is not produced, a defendant may then seek a court order. § 1054.5(b). But to obtain such an order, the defendant must make a showing that the prosecution has not complied with discovery requirements. *Id*. Balderree presented no evidence to the state court suggesting Cohen could have made such a showing; his own firm belief that the evidence existed would not have been sufficient. California courts undoubtedly know what their own law requires, and their conclusion that an informal request was enough is not unreasonable.

---

[2] It is possible that if Lattman had been contacted and Cohen had decided to pursue a "ramming defense" instead of an "inadvertent strike defense," Balderree himself might have decided to take the stand to testify that the brown SUV rammed his vehicle. But had he done so, he would have been required to testify to the truth as he understood it, *i.e.*, that he was attempting to negotiate the gap when the brown SUV hit him. He could not have offered testimony consistent with Lattman's.

Furthermore, under AEDPA, the state court's factual determinations, are "presumed to be correct," unless rebutted by "clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *see also Hernandez v. Small*, 282 F.3d 1132, 1135 n. 1 (9th Cir. 2002). The Court therefore accepts that Cohen did ask for the video recordings and that when he was told there were none, he could not reasonably have gone further. Finally, as noted above, there is still no evidence that any such recordings exist or ever existed. Failure to find evidence that could not be found is not unprofessional error.

**Use of Harmful Expert Witness**

Balderree argues that a witness Cohen called, an accident reconstructionist named Ronald Carr, who offered testimony that turned out to be disastrous for him. Had Cohen adequately determined what Carr would say, Balderree argues, Cohen would not have called him to testify.

Carr created a computer simulation of the collision. He used prosecution photographs and assumed the brown SUV was stationary. His own unsworn letter also shows he relied on information Cohen sent him, standard research into automobile specifications, and aerial photographs of the location. (Lodgment 14, Ex. B.) He did not visit the scene, interview Lattman, or inspect the vehicles himself. (*Id*.)[3] As the R&R notes, the last reasoned decision on this claim was by the California Superior Court.

Balderree argues that Carr's reconstruction simulation was disastrous for his case, and supported the prosecution's theory completely. He concludes Cohen could not have viewed the simulation before trial, because otherwise he would not have allowed Carr to show it.

This claim is lacking in any real evidence at all; all Balderree is able to offer is his own conclusions. The California Superior Court pointed this out. (Lodgment 11, 4:19–28.) That court concluded there was no evidence the simulation was inconsistent with the defense's

---

[3] Carr's letter points out that it isn't intended to be a declaration, and invites Balderree to have a declaration prepared and sent to him, which he would consider signing. Balderree apparently never did this, because there is no declaration from Carr included, and no explanation of why one could not be obtained.

"inadvertent strike" theory. (*Id.*) It may have been inconsistent with the theory Balderree wished Cohen had used, but that doesn't amount to ineffective assistance. Nor is there any evidence to support Balderree's conclusion that Carr was in effect a witness for the prosecution.

**Summary of IAC Analysis**

The Court concludes that while a prudent attorney would have interviewed Lattman, Lattman's testimony was not of any great use, and could have been a liability. Because there was no good evidence to support a "ramming" defense. Cohen was not ineffective for relying on a different theory of defense, the "inadvertent strike." Furthermore, there is no reasonable probability that relying on a "ramming" defense would have yielded a different result.

Although Balderree presents evidence showing that Cohen failed to conduct the type of pretrial investigation he should have, Balderree is unable to show that that investigation would have yielded any useful evidence. The best he can offer is his own suspicion that somewhere there was a helpful witness, or that physical evidence (which he never provides) would have proved his point. This isn't enough to satisfy *Strickland*'s "reasonable probability" standard. *See Strickland*, 466 U.S. at 694.

Although it is clear Cohen and Balderree did not see eye to eye, and the Court accepts Balderree's representations that Cohen repeatedly rejected his ideas for trial strategy, this doesn't amount to ineffective assistance of counsel. *See Morris v. Slappy*, 461 U.S. 1, 13–14 (1983) (holding that the Constitution dos not guarantee a meaningful relationship between a defendant and his counsel). Cohen's alleged failure to give adequate consideration is a professional error, but because Balderree can't show any reasonable likelihood a different strategy would have had a different outcome, no prejudice is shown. The most serious charge, that Cohen didn't conduct thoroughly enough pretrial investigation, also fails for want of prejudice. Balderree is unable to point to any evidence Cohen would have found that stood any reasonable probability of altering the outcome of the case.

Because there was little or no harm from Cohen's errors, the Court rejects Balderree's cumulative error argument.

**Conclusion and Order**

The R&R is **MODIFIED** as discussed above. So modified, Balderree's objections to it are **OVERRULED** and it is **ADOPTED**. The petition is **DENIED**.

The Court will issue a certificate of appealability only if Balderree has made a substantial showing of the denial of a constitutional right, and to the extent jurists of reason might find its constitutional rulings debatable. *See Slack v. McDaniel*, 529 U.S. 473, 484 (2000); 28 U.S.C. § 2253(c)(2).

Balderree has made no showing at all that admission of prior vehicular flights is a constitutional claim, nor that jurists of reason would find it debatable. Because there is no evidence the video recordings Balderree sought exist, or ever existed, or if they do exist, that they are exculpatory, the denial of his *Brady* claim is not debatable among jurists of reason. His entitlement to discovery on habeas review also does not present a substantial constitutional claim. With regard to his sufficiency of the evidence claim, the Court notes the extra layer of deference. The evidence was easily sufficient to support a conviction, and the state courts' determination of that was not unreasonable. Jurists of reason would therefore not find that ruling debatable.

The IAC claim is the most complex, but as with the sufficiency of the evidence claim, it is entitled to double deference. His argument based on Cohen's alleged failure to request video recordings is foreclosed by the state court's finding that Cohen did request them, as well as by the lack of evidence that they even existed. Balderree failed to show that Cohen's failure to investigate or find witnesses caused prejudice because there is no evidence that the investigation would have uncovered anything helpful. If any evidence existed, Balderree was in the best position to say what it was, but he has not identified anything. Cohen's failure to investigate the testimony of Nancy Lattman was harmless, because her testimony would not have been helpful, and might have been harmful.

/ / /

The most serious of his charges against Cohen was that Cohen didn't communicate with him. *See Strickland*, 466 U.S. at 688 (holding that counsel has a duty "to consult with the defendant on important decisions and to keep the defendant informed of important developments in the course of the prosecution"). While the Court believes the record, especially the record as presented to the state court, made clear that Cohen did meet with Balderree and discussed issues such as evidence and trial strategy with him, it is possible reasonable jurists would find this debatable. Some jurists might, for example, have thought an evidentiary hearing was required to clarify the extent of the consultation. The Court therefore **GRANTS** a certificate of appealability as to this issue only. As to all other issues, including cumulative prejudice by Cohen's other alleged errors, the certificate is **DENIED**.

**IT IS SO ORDERED**.

DATED: August 23, 2013

*Larry A. Burns*

**HONORABLE LARRY ALAN BURNS**
United States District Judge